[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case presents issues involving the tragic failure of an international adoption, the interface of adoption with the law of termination of parental rights, the psychological illness known as reactive attachment disorder, and poor social work.
 I
The respondents are Michael and Kathleen P. (hereafter, Mr. P and Mrs. P). After twenty years of a childless marriage, Mr. P. became determined CT Page 2510 to adopt children. Mrs. P. was less enthusiastic about such an undertaking. She had obtained her undergraduate degree in her thirties and was now working on her masters degree. She had reconciled with being childless and feared that adoption would upset her life and the completion of her masters thesis.
Mrs. P eventually agreed to adopt children. The respondents further agreed that they would only adopt healthy children. Mrs. P. admits that she wanted only "undamaged" children. Fearing that adopting an American child would more likely require them to cope with the physiological and behavioral effects of biological parents substance abuse, the respondents resolved to seek an international adoption.
The respondents began their effort to adopt a child in the summer of 1994. For a year they worked to get their finances in order. In March, 1996, they learned that there were three children in Lithuania who were available for adoption. In June, 1996, they traveled to Lithuania and met the three children: Michael, age 7; Brendan, age six; and Kristina, four. The children were siblings. The respondents were told by the Lithuanian authorities that the children's father had recently died and that their mother could not afford to care for them.
The respondents subsequently learned, shortly before the actual adoption in Lithuania, that this account was a lie. In fact, the children's parents had been alcoholics. Michael and Brendan had been the victims of severe neglect and had lived in an orphanage. Kristina had never been taken home after her birth. Rather, since her birth she had been institutionalized in the same orphanage as her brothers. The children had been abused and denied food in the orphanage. On one occasion, the boys had jumped out of a window in an effort to retrieve apples from a tree. The respondents recognized that such children would have specialized needs.[1]
Mrs. P. candidly told her husband as well as their attorney that she did not want to adopt children with such needs. She recognized that she was not prepared to parent them.[2] The husband admits that forced his wife to adopt the children.
The respondents obtained a second mortgage and constructed an addition to their home. Even before they brought the children home, the adoption endeavor had cost them $20,000, not including travel. At that time the respondents had, at best, a middle class income.
In October, 1996, the respondents brought the children home to Connecticut. As Mrs. P. had feared, the children had multiple of problems. In addition to the language barrier, Brendan and Michael CT Page 2511 had an eating disorder borne of malnourishment, bed wetting, some sexual acting out, and behavioral issues.
However, it was Kristina who had the most serious problems. While she had many of the same problems as her brothers, she was very oppositional and defiant and had severe tantrums. On the one hand, Kristina would not bond or respond appropriately to her parents. On the other hand, she would warm to and cuddle with anyone. She also suffered from fetal alcohol syndrome and had an IQ of only 70 to SO.
The respondents' lives changed drastically and deteriorated into crisis. Although Mrs. P. wished to continue to work on her thesis, parenting the children consumed all of her time. Mr. P. worked full time. Mrs. P. eventually arranged for an unlicensed babysitter for the children so that she could work on her thesis. Mr. P., who worked full time, believed that he was developing a bond with Kristina and could not understand why his wife was not, nor why she did not love Kristina. Mrs. P. soon became resentful and angry.
In the Spring of 1997, the respondents sought the assistance of Casey Family Services, a private organization that specialized in adoption. Mrs. P. asked Casey for assistance in placing Kristina in a therapeutic foster home. At Casey, the respondents met Dr. Eileen Gruenberg, Ph.D., a license clinical psychologist. The family soon began therapy with Dr. Gruenberg.
Casey did not place Kristina in a therapeutic foster home. The respondents were distressed and overwhelmed by the chaos in their lives Kristina was creating. To make matters worse, Mr. P. had bipolar disorder for which he had not yet received medication. The respondents' marriage was rapidly deteriorating. On August 20, 1997, the respondents voluntarily sought assistance from the Department of Children and Families (DCF). The following day, however, DCF received a report from the respondents' babysitter alleging, inter alia, emotional neglect of Kristina, not purchasing her needed glasses, and hitting her.
DCF's involvement would not be voluntary as the respondents' had contemplated but "protective." The DCF social workers, Jennifer Davis and later Michelle Byam, confronted the respondents with the allegations against them. Some of the allegations were true; some were not. Mrs. P. was emotionally neglecting Kristina in the sense of rejecting Kristina's even superficial attempts to warm to her. Mrs. P. also sent Kristina to her room for inordinately long periods of time and sometimes vented her anger with Kristina by slapping her across the face. On the other hand, allegations that the respondents were denying the children food and denying Kristina optical care were false. Other allegations by the social CT Page 2512 workers, such as that the home was filthy and had loose wires hanging, were also inaccurate.
DCF mandated that the respondents and the children engage in individual therapy. This created a serious financial problem for the respondents. There was a $20 co-pay for the therapy, which was with Dr. Gruenberg. Because DCF had designated the case as protective, the respondents did not qualify for a DCF subsidy of this expense. Mrs. P. at first angrily insisted that the children could not benefit from therapy. She later conceded that they needed it.
DCF also referred the respondents to Family Preservation Services (FPS) for services. This was on a voluntary basis.
Mrs. P. asked DCF for respite services, whereby DCF would take Kristina for a few days at a time. DCF offered only a few hours of respite to Mrs. P., which was wholly inadequate.
Through Dr. Gruenberg, the respondents, as well as DCF and FPS, learned that Kristina suffered from reactive attachment disorder (PAD). As explained to the court by Dr. Michael Haymes, Ph.D., a licensed clinical psychologist who conducted an evaluation of the family in April, 1998, RAD is
 a condition whereby either early physiological or interpersonal conditions interfere with the normal early models of relating that later get internalized as either healthy relating or very different relating.
 It's usually a problem in bonding. The bonding either didn't work in the first place, or it was interfered with by either something about their interaction.
 As a result, the child does not develop [t]he basic trust that . . . needs can be met in an interpersonal relationship and . . . they engage people in a demanding way.
 They're often clingy, demanding, Oppositional, develop a variety of power techniques to assert themselves in [a] way that, you have to look hard to realize that this is, actually, in the pursuit of some normal need for efficacy in the world because otherwise, it looks like the kid is doing all negative things and you can't imagine why they would . . . CT Page 2513 continue to just be so negative. This results in problems in relating usually to anybody they need to compromise with.
 There's often learning lags. Very frequently, there's a development of pseudo intimacy, kinds of issues where they will immediately respond to strangers as intimates.
Dr. Haymes also explained that, to the untutored and uninitiated, RAD children may appear to be normal, needy, victimized children. RAD children may also lie, steal, destroy their own and other's property; lack impulse control and indiscriminately refer to people as "mom" or "dad."[3] Parents of such children may appear hostile and angry because ihey are "drawn into the negative cycles that the child evokes."[4]
DCF and PBS were aware of Kristina's RAD diagnosis. However, although RAD is a common condition among children who have been institutionalized early in their lives, both DCF and FPS failed to appreciate the extreme nature and consequences of Kristina's RAD. They also were insensitive to the catastrophic effects Kristina's RAD was having on the respondents and their sons. For example, a December 22, 1997 report from FPS states: "DCF reports that [Mrs. P.] was using Kristina's diagnosis (diagnosed by Dr. Gruenberg) of Reactive Attachment Disorder (RAD) as an excuse not to bond with her and to reject her from the family."[5] The same report states: "FPS continued to look for criteria behaviors from Kristina to support the RAD diagnosis but was unable to observe any other then [sic] abnormalities in eye contact." Michelle Byam told Mrs. P. to work on her parenting skills so that she could bond with Kristina.
Through the second half of 1997, the respondents, especially Mrs. P., became increasingly resentful of DCF. The respondents were angry with each other and were angry with DCF for failing to recognize the extraordinary stress they were under. DCF and FPS continued to blame Mrs. P. for the crisis created by Kristina's RAD. They were accusatory and failed to offer meaningful respite or other significant support.[6]
The respondents, especially Mrs. P., continued to be overwhelmed by and angry about Kristina's behavior. The situation became so serious that Mr. P. feared Kristina's being alone with Mrs. P.[7] Notwithstanding, the respondents had both bonded to the boys and dealt appropriately with the boys' issues.
Mrs. P. inquired of DCF if their adoption of Kristina could be reversed and whether DCF could place Kristina in a therapeutic foster home, a home in which the caretakers had received substantial training in the nature and treatment of RAD. CT Page 2514
In December, 1997, DCF issued a report which the respondents considered vilified them and was rife with inaccuracies. They asked to meet with DCF to dispute the inaccuracies. The meeting took place on December 16, 1997 and became heated. Although in September and October, 1997, Mrs. P. had become somewhat hopeful about Kristina's condition, and more equivocal about having her removed from the home, by the time of the meeting, she again believed that Kristina needed to be in a therapeutic foster home. Dr. Gruenberg, too, favored a planned, thoughtful and cooperative placement of Kristina to therapeutic foster care.
Unknown to the respondents, prior to their meeting with DCF on December 16, 1997, social worker Michelle Byam had prepared a petition alleging that all three children were neglected and uncared for, together with an application for order of temporary custody (OTC). Also unknown to the respondents, during their meeting with DCF, the petition was filed, a judge of the Superior Court signed the OTC, and all three children were removed from their school and taken into custody.
The neglect petition alleged that Kristina had RAD and that Mrs. P. had severely emotionally abused her. Mr. P. was alleged to be the sole care giver who self medicated with alcohol and failed to prevent the mother's emotional abuse. The petition further alleged that Mrs. P. had not wanted to adopt her children but had felt forced to by Mr. P., that she "has refused to feed, bathe and take care of her children," and was aware that she had been emotionally abusing her daughter. Intensive Family Preservation worker Tony Lapenta and Dr. Gruenberg were alleged to have stated that the parents were "full of rage" and that Mrs. P. was emotionally abusing Kristina.
The respondents were frantic over the removal of their children. They knew that the sudden and surreptitious removal by the State would be horrific to the children, who had been held, neglected and abused in a state orphanage in Lithuania. The respondents asked DCF why it had taken all three children. They were told that DCF wanted to keep all three children together. The respondents demanded to see their children. A visit, was arranged the following day, December 17, 1997. At the visit, Mr. P. became angry and upset when he observed Kristina sitting on the lap of a DCF social worker. The respondents demanded a Christmas eve visit other than at DCF. DCF denied the respondents any Christmas eve visit.
By January 2, 1998, the respondents had retained a private attorney and had filed a motion for visitation and a motion to dismiss the OTC. Because of the manner in which DCF had handled the case and the surreptitious manner in which DCF had taken their three children during the December 16, 1997 meeting, the respondents now communicated with DCF CT Page 2515 only through their attorney or Dr. Gruenberg.
On January 2, 1998, the respondents and DCF reached an interim partial agreement. The OTC on the boys was vacated immediately; the OTC on Kristina would continue without prejudice. The children would be psychologically evaluated by Dr. Haymes, but Dr. Gruenberg would remain the children's therapist. DCF agreed to explain to the boys that their parents had not asked to have them removed and agreed, absent extraordinary circumstances, not to meet the boys in school to talk to them without prior notice to the respondents, their lawyer or Dr. Gruenberg. The agreement was approved by the court (Driscoll, J.) on January 8, 1998.
The respondents and their sons had a visit with Kristina on January 14, 1998 at Dr. Gruenberg's office. Thereafter, the only visits that occurred until February, 1999 were visits between Kristina and her two siblings.
During the first half of 1998, both respondents reconciled themselves to the reality that Kristina ought not return home and that they should terminate their parental rights. On May 27, 1998, their attorney so advised DCF social worker Jennifer Chokas by letter. The following month, however, the situation changed. On June 9, 1998, the respondents' attorney again wrote Chokas, stating:
 I have again reviewed the proposal that [the respondents'] parental rights in Christina [sic] be terminated by consent. They have given it additional thought. They have decided that they are not willing to terminate their parental rights in Kristina at this time. While they can not take her home now nor or in the foreseeable future their maintenance of their parental rights will permit them to advocate for Kristina and it will ensure them an avenue to see that Kristina and the boys can visit with each other. At such time when a permanent family is found for Kristina they will be open to terminating their parental rights provided an arrangement is made to preserve a visiting relationship between the 3 children. The decision has been made after careful additional thought and some discussion with the children's therapist.
On June 11, 1998, the parties appeared in Superior Court for Juvenile Matters in Montville. The neglect petitions were withdrawn with respect to Brendan and Michael. With respect to Kristina, the neglect petition CT Page 2516 was amended to allege that she was "uncared for."[8] The respondents pleaded no contest to the amended petition and Kristina was committed to the custody of DCF. That day, DCF also filed a petition to terminate the respondents' parental rights based on their consent. The respondents were excused from pleading to that petition that day.
Sibling visits have continued since 1998 at Amps, Inc., a private agency in Vernon, Ct. that provides a facility for supervised visitation and parenting education. The respondents sometimes saw Kristina during these visits and informally exchanged a few words with her. These encounters were usually pleasant but sometimes awkward.
The respondents told Dr. Gruenberg that they wished to visit with Kristina. Dr. Gruenberg communicated this to DCF. Dr. Gruenberg recommended that the respondents be afforded one or two "closure" visits to facilitate a decision to terminate their parental rights.
On September 24, 1998, during a sibling visit, Ann Tuller, president of Amps, discussed with DCF social worker Jennifer Chokas Tuller's concern that Kristina was expressing a desire to see her parents. Chokas remarked that as a form of "emotional blackmail," DCF was not allowing such visits. Chokas confirmed that DCF would not allow such visits unless the respondents consented to the termination of their parental rights. DCF has not disputed that this conversation, including Chokas' remarks, occurred.
In November, 1998, DCF social worker Patricia Marchand was assigned the case. Unlike her predecessor, Marchand approached the case, as well as the respondents and their attorney, in a professional and competent manner. She was aware that the respondents' attorney was requesting that the respondents be allowed "closure" visits with Kristina. The attorney represented that the respondents might be willing to terminate their parental rights with conditions. DCF now agreed to a visit if Dr. Gruenberg were present to promote Kristina's comfort with the encounter. In February, 1999, the respondents had their first and last visit with Kristina since January, 1998.
On October 27, 1999, the court (Rogers, J.) granted DCF's motion to amend its termination petition to allege that Kristina had been abandoned by the respondents and that there was no ongoing parent-child relationship between the respondents and Kristina.
 II
General Statutes § 17a-112 governs the termination of parental rights with respect to petitions originally filed in Superior Court. CT Page 2517 "Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112(b) exists by clear and convincing evidence." (Footnote and internal quotation marks omitted.) Inre Eden F., 250 Conn. 674, 688, 741 A.2d 873 (1999). "In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment."In re Kasheema L., 56 Conn. App. 484, 487, 744 A.2d 441, cert. denied,252 Conn. 945, 747 A.2d 522 (2000); id., 490; see Practice Book §33-3(a). The latest amendment, and the one that pleads the grounds for termination on which DCF now relies, is August 20, 1999. "If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." In re Eden F., supra, 689.
 III
DCF first claims that Kristina has been abandoned by the respondents "in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." In support of this ground, DCF alleges that:
 * Dr. Haymes, court ordered psychologist, concluded that in terms of position of Kristina in the family system, it is one of total exclusion by the adoptive parents. Mr. and Mrs. P. made it clear that they had no intention of attempting to reunite with their adoptive daughter.
 * Mr. and Mrs. P. have requested visitation with their daughter three times since her placement in foster care. They have not requested to reunify with their daughter.
 * On May 19, 1998, Mr. and Mrs. P. stated to [DCF] social worker Jennifer Chokas, that they were in agreement with the voluntary termination of their parental rights.
To prove a claim of abandonment, General Statutes § 17a-112(C)(a) requires that a petitioner prove that: "The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ." As used in this statute, the word parent includes adoptive parent. See General Statutes § 17a-93(b).[9]
CT Page 2518
"Appellate courts have repeatedly observed that [a]bandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. (Citations omitted; internal quotation marks omitted.) In re Angellica W., 49 Conn. App. 541, 551,714 A.2d 1265 (1998). "Attempts to achieve contact with a child, "telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . .
"Section 17a-112(b)(1) does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern. . . .
"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . ." (Internal quotation marks omitted.) In re John G., 56 Conn. App. 12, 20-21,740 A.2d 496 (1999).
In addressing the claim of abandonment it is helpful to reexamine the facts in five distinct time periods. The first time period is October, 1996 to December 17, 1997. This period embraces the respondents' adoption of the children to the granting of the OTC.
Mr. P. very much wanted to adopt Kristina; Mrs. P. did not wish to do so but was forced to do so by Mr. P. Mr. P. loved and cared for Kristina. Mrs. P. was angry with Kristina for her behavior and the disruption she had created in the respondents' lives. At times Mrs. P. hated Kristina and wanted to reverse the adoption. She punished her for having tantrums by slapping her and restricting her to her room for unduly lengthy periods. At all times, however, the respondents provided Kristina with food, clothing, supervision a home and counseling. The court does not find that the respondents deliberately and unduly delayed getting Kristina new eye glasses, as claimed by DCF.
The second time period is December 17, 1997 to January 14, 1998. This period includes the granting of the OTC of all three children to CT Page 2519 respondents' visit with Kristina. Though brief, it was during this period that the respondents' relationship with DCF became irretrievably damaged. First, when DCF obtained the OTC, it was meeting with the respondents who were disputing DCF's version of events and its conclusions. Second, the OTC, which was granted ex parte, was wholly unwarranted, especially with respect to the respondents' sons. Any insinuation in the petition that the children were not fed, bathed or cared for — the only statements in the petition that would have justified an OTC in light of In re Juvenile Appeal (83-CD), 189 Conn. 276,287-89, 455 A.2d 1313 (1983)[10] — was entirely unfounded.[11]
Third, DCF refused to allow the respondents to give their children Christmas presents. The respondents, having been in difficult financial straits since their decision to adopt children, had to hire a private attorney. The significance of these events is that they explain the respondents' lack of trust in DCF and their insistence in dealing with DCF through third parties.
The third time period is January 14, 1998 to May, 1998. Although their attorney had filed a motion for visitation on January 2, 1998, the respondents did not press that motion nor otherwise seek a visit with Kristina. Nor did the respondents inquire as to how they could write or send presents to Kristina. The respondents reconciled themselves to not reuniting with Kristina and, in fact, to terminating their parental rights with respect to her.
The fourth period is June to October, 1998. Although they recognized that they should not reunite their family with Kristina, the respondents were no longer willing to unconditionally consent to the termination of their parental rights, at least until "a permanent family is found for Kristina. . . ." They wanted to "advocate for Kristina," to "ensure . . . that Kristina and the boys can visit with each other." The respondents wished to visit with Kristina and communicated this to Dr. Gruenberg, Kristina's therapist, and to Ann Tuller. Kristina, too, asked to see the respondents during ten out of eighteen sibling visits, although her reason for doing so was as much to please her brothers and elicit the respondents' approval as it was to see them. She frequently referred to the respondents by their first names. Even when she used the appellation "mommy," however, it was not an acknowledgment of parental status. Kristina referred to many people, including her therapist and social worker as "mommy." Dr. Gruenberg recommended to DCF that it allow two "closure" visits. DCF disagreed with Gruenberg and disallowed any visits.
The final period is November, 1998 to October 27, 1999. Patricia Marchand became Kristina's DCF social worker. The respondents finally visited with Kristina in February, 1999. Mr. P. continued to cover CT Page 2520 Kristina on his health insurance plan. DCF was willing to offer two "closure" visits — visits conditioned on the respondents agreeing to terminate their parental rights. The respondents were unwilling to consent to such a condition although they continued to have no intention of reunifying with Kristina. They insisted that Kristina be placed in a therapeutic foster home. DCF refused. The respondents did not send gifts or letters to Kristina, although they continued to see Kristina informally and fleetingly at sibling visits. The respondents still did not communicate directly with the DCF social worker. However, they inquired about Kristina's welfare through Dr. Gruenberg.
DCF argues that there has been at best only sporadic contact between the respondents and Kristina and that the respondents' failure to maintain a reasonable degree of interest, concern or responsibility as to the welfare of Kristina is evidenced by (1) the respondents' emotional abuse or overt rejection of Kristina, (2) their willingness to consent to termination of their parental rights; (3) their unwillingness to reunite with Kristina; (4)the respondents' failure to telephone, Kristina, to acknowledge her birthdays of significant holidays or to learn more about Kristina.
The respondents' "emotional abuse or overt rejection of Kristina" prior to the OTC is certainly a consideration in determining whether the respondents have abandoned Kristina. However, this conduct is fairly ascribable only to Mrs. P. Moreover, during this period, the respondents provided Kristina with food, clothing, supervision a home and individual counseling with a competent psychologist.
The respondents' willingness to terminate their parental rights, in the context of this case, is a double edged sword. DCF admits that the respondents considered this option in 1998 because they believed it was in Kristina's best interests. Trial Brief of Petitioner, p. 11. They believed that termination might be in Kristina's best interests because of her RAD, which they were unable to manage. Again, abandonment being the lack "of a reasonable degree of interest, concern or responsibility as to the welfare of the child" the respondents' contemplation of a course of action which they and DCF considered to be in Kristina's best interests does not show abandonment. For the same reason, their unwillingness to reunite, a course in which all experts who gave testimony concurred, is not as probative as it would be in circumstances where foregoing reunification would be contrary to the child's psychological interests. This is so notwithstanding that the respondents' unwillingness to reunite was an acknowledgment of their inability to parent Kristina.
The final matter to which DCF points is the respondents' failure to CT Page 2521 visit, phone, acknowledge birthdays or significant holidays or learn more about Kristina's life. This would be highly probative were it not for DCF's efforts to sabotage any relationship between the respondents and Kristina. Although the respondents failed to request visitation for much of the first half of 1998, the court cannot fairly predicate a finding of abandonment on the default during that period when the respondents then requested visitation through their intermediaries — their attorney and Dr. Gruenberg — from June, 1998 to October 27, 1999, when the termination petition was amended to allege abandonment.
DCF contends that the instant case is analogous to In re Shane P., supra, 58 Conn. App. 244, 251-52, 754 A.2d 169 (2000). In Shane P., the father was a high school drop out and drug addict with a lengthy felony record. As a result of an incident in which he had smoked cocaine with his wife and Shane in the car, and had then assaulted police officers who came to the scene, he was convicted of multiple counts of risk of injury, assault on a police officer and possession of narcotics. He received a total effective sentence of ten years, suspended after five years with five years probation. The trial court found: "The father abandoned Shane between his arrest in October, 1995, and his request for a visit in February, 1996, a five month period. Over the next year, the father made several direct and indirect requests for visits, and [the department] failed to respond. In February, 1997, however, the father expressed ambivalence concerning whether he wanted a visit. After a March, 1997 request for a visit by the paternal grandparents on [the respondent.'s] behalf, the father visited Shane in August and October, 1997. At the October visit, the father again exhibited some ambivalence and then failed to request another visit until five months later in March, 1998. At no point has the father recognized Christmas or Shane's birthday. . . . On the whole, the court finds that the father's level of interest in his son was sporadic, which is not sufficient to defeat statutory abandonment." In re Shane P., supra, 58 Conn. App. 251-52. The Appellate Court held that "the evidence was sufficient to support the determination that the respondent abandoned Shane." Id., 252.
Here, by contrast, except for the time period January to May, 1998, the respondents have continually expressed an interest in Kristina to her therapist, Dr. Gruenberg. Kristina is a RAD child, unlike Shane. The respondents have continually requested visits with her, since June, 1998, which DCF has generally refused. They have maintained that they wanted to be her advocate. They have expended their own monies to assert that advocacy. That they have communicated their expressions of interest and their desire for visitation through third parties is understandable given DCF's unwarranted taking of their sons. Nonetheless, the question of abandonment is a close question. However, in termination of parental rights cases, where a question is close, the court must defer to the CT Page 2522 clear and convincing evidence standard. Under these circumstances the court cannot find by clear and convincing evidence that the respondents have abandoned Kristina.
 IV
The second adjudicatory ground that asserted by DCF is that there is no ongoing parent-child relationship between the respondents and Kristina. General Statutes (Rev. to 1999) § 17a-112(c)(3)(D) "provides for the termination of parental rights if, upon clear and convincing evidence, it is proved that no ongoing parent-child relationship has existed in excess of one year. This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would. be detrimental to the child's best interest to allow time for such a relationship to develop. . . .
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent. . . . Feelings for the natural parent connotes feelings of a positive nature only. . . ." (Internal quotation marks omitted.) In re John G., 56 Conn. App. 12,22-23, 740 A.2d 496 (1999).
Both respondents essentially admitted at trial that there was no parent-child relationship between either of them and Kristina at the time of the OTC nor at any time thereafter. This opinion is shared by Dr. Gruenberg. The court affords considerable weight to the opinions and observations of Dr. Gruenberg, not only because she is an experienced clinical psychologist with experience with RAD children, but because she is the therapist for the respondents as well as Kristina, and has been for over 2 1/2 years. "The testimony of professionals is given great weight in parental termination proceedings. . . ." (Citations and internal quotation marks omitted.) In re Carissa K., 55 Conn. App. 768,781-82, 740 A.2d 896 (1999).
The second prong of this analysis requires "the court [to] look into the future and determine whether it would be detrimental to the child's best interest to. allow time for such a relationship to develop." In reCT Page 2523John G., supra, 56 Conn. App. 22. "The factors to be considered in deciding whether it would be in [Kristina's] best interest to permit further time for a relationship with her [parents] to develop include (1) the length of the stay with her foster parents, (2) the nature of her relationship with her foster parents, (3) the degree of contact maintained with the [adoptive] parent and (4) the nature of her relationship to her [adoptive] parent [5] . . . . In addition, the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider. . . . Furthermore, it is well established that a trial court [is] free to judge the credibility of the expert witnesses." (Citations and internal quotation marks omitted.) In reSavanna M., 55 Conn. App. 807, 816, 740 A.2d 484 (1999). Here, of course, there is no genetic bond between Kristina and the respondents.
Kristina, tragically for a RAD child, is in her third foster placement since June, 2000. While the testimony from her current foster mother is hopeful and optimistic, Kristina's past experience in family settings, her age and the relatively severe nature of her RAD convinces the court that she may not be beyond the "honeymoon" stage in that placement at the time of trial. However, she thus far has positive feelings and a warm relationship with her foster mother who loves her.
There has been little contact between Kristina and the respondents since the OTC. For nearly the first six months of 1998, the respondents did not seek visitation. Thereafter, they did. DCF, however, was not willing to permit visitation until November, 1998. One visit occurred in February, 1999. Since that time, DCF's position has been that it will permit only one or two closure visits.
Kristina has little relationship with the respondents. She views them as the people who rescued her from a Lithuanian orphanage. She has some warm feelings for Mr. P. and perhaps at times even for Mrs. P. whose treatment of her was harsh and rejecting. However, Kristina's feelings about the respondents are complicated by their having attempted to parent her without knowing that she suffered from RAD and how to deal with such a child.
The overarching fact is that while the respondents may wish for a relationship with Kristina, the respondents have not contemplated establishing a parent-child relationship with Kristina, at least since early 1998. They do not envision reunifying with her at any time. Rather, they wish to be Kristina's advocate. As laudable or as misguided as this desire may be, such advocacy alone will not give rise to a parent-child relationship. Moreover, Dr. Gruenberg testified that (1) the respondents cannot meet Kristina's specialized needs, and (2) to allow CT Page 2524 further time for the establishment of a parent-child relationship between the respondents and Kristina would not be in Kristina's best interests.
By clear and convincing evidence, the court finds that there is no ongoing parent-child relationship between the respondents and Kristina and that to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to Kristina's best interests.
 V
General Statutes § 17a-112(c) provides that before a termination may be granted, the court must find by clear and convincing evidence DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b
that such efforts are not appropriate. . . ."
On May 20, 1999, the court found that continuing efforts to reunify Kristina with her parents were no longer appropriate. Since none of the aggravated circumstances enumerated in General Statutes § 17a-111b
are present in this case, the court assumes that the May 20, 1999 finding was made pursuant to General Statutes § 17a-110(b). Because of the court's finding, DCF claims that "no further finding is needed regarding reasonable efforts." The respondents disagree, arguing that DCF never made reasonable efforts to reunify and, in fact, prevented reunification by wrongfully preventing visitation.
In In re Gilbert C., Superior Court, Child Protection Session at Middletown, No. H14-CP97-005326-A (January 2, 2001), I undertook an analysis of the relevant statutes and case law and held that a finding pursuant to General Statutes § 46b-129(k), and hence under §17a-110(b), that further efforts to reunify a parent and a child are not appropriate does not necessarily vitiate the requirement pursuant to § 17a-112(c) that DCF use reasonable efforts to reunify from the time it takes custody of a child to a reasonable time preceding the court's "no further efforts" finding, "unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts.
As discussed supra, the court finds that the respondents have never desired reunification with Kristina. Rather, they seek to be her advocate. As Dr. Gruenberg opined, the respondents cannot meet Kristina's specialized needs. By clear and convincing evidence, the court finds that CT Page 2525 from January 14, 1998, the date of the respondents' first visit with Kristina following the OTC, until the court's finding of May 20, 1999, the respondents have been unable to benefit from reunifications efforts.
 VI
"If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether the termination of parental rights is in the best interests of the child. . . . The dispositional phase, like its adjudicatory cousin, also must be supported on the basis of clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 207, 742 A.2d 415
(1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Citations omitted; internal quotation marks omitted.) Inre Shyina B., 58 Conn. App. 159, 167, 752 A.2d 1139 (2000), quotingSchult v. Schult, 241 Conn. 767, 777, 699 A.2d 134 (1997).
The respondents' plea to allow them to be Kristina's advocate is not fanciful. Kristina needs an advocate. Moreover, DCF workers and a supervisor mismanaged this case until Patricia Marchand became the social worker. They were insensitive to the respondents' ordeal and failed to offer them necessary respite; recklessly ripped three children from the respondents without any basis as to the boys and without the care and planning advocated by Dr. Gruenberg; represented that it was denying the respondents visitation with Kristina as a form of "emotional blackmail"; refused to provide Kristina with therapeutic foster care as recommended by Dr. Gruenberg, her therapist, and placed her in three foster homes, especially damaging to a RAD child.
Were the court to deny the petition, Kristina's advocate would be her attorney or guardian ad litem. See, e.g., Ireland v. Ireland,246 Conn. 413, 439-40, 717 A.2d 676 (1998). Given the unfortunate history of this case, the respondents could not represent Kristina'.s interests apart from their own and without being impaired by the enormous emotional baggage they carry from this case.
Also, were the court to deny the petition Kristina would be required to remain in foster care indefinitely. It is true that "studies of children in long-term foster care have provided evidence that suggests that continued contact with the natural parent generally promotes the child's sense of well-being and emotional security even for children who were separated from their parents at a very early age and whose subsequent contacts with their parents are sporadic." (Citations and internal CT Page 2526 quotation marks omitted.) In re Alissa N., supra, 56 Conn. App. 211 n. 5. Kristina, however, is not the respondents' biological child nor a child with whom they ever bonded. The reality of this case is that Kristina would experience little or no positive effects from contact with the respondents.
Like all children her age, Kristina needs permanency. Continuing a nominal legal relationship between the respondents and Kristina will eventually if not immediately result in even greater confusion and uncertainty as to who is her family and subvert any hope of permanency for this special needs child. On the other hand, Kristina's current foster mother is genuinely considering adopting her. While the court is not as sanguine about the ultimate outcome as is the foster mother and DCF, continuing the legal relationship can only delay if not destroy any hope of adoption.
Finally, the two people who Kristina has consistently and positively regarded as her family are her brothers. It is vitally important, now and in the future, that Kristina continue to view them as doing well and as stable fixtures in her life. To re-inject Kristina into the respondents' lives would likely renew the turmoil that very nearly destroyed the family that has brought stability to the boys. Because that would not be in the boys' interests it is not in Kristina's interest. In the peculiar circumstances of this case, what is in the best interests of the boys is generally in Kristina's best interests. It is time for the respondents to let go of direct involvement with Kristina and focus their attention on their sons. That is in Kristina's best interests.
By clear and convincing evidence the court finds that it is in Kristina's best interests that the respondents' parental rights be terminated.
 VII
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in § 17a-112(d)." In reTyscheicka H., 61 Conn. App. 19, 26, 762 A.2d 916 (2000).
 Mandatory § 17a-112(d) Findings 1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made. available to the parent and the child by aCT Page 2527child-placing agency to facilitate the reunion of the child with theparent.
DCF offered foster care, minimal respite and intensive family preservation services. No services were rendered after January, 1998 to facilitate reunion.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
DCF did not make reasonable efforts to reunite the family. However, at no time did the respondents contemplate reunification with Kristina. Nor was reunification a reasonable possibility. The respondents were unable to meet Kristina's specialized needs. Thus, the respondents were unable to benefit from reunification efforts.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
There was no such court order in this case.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Despite her isolated and disingenuous expressions of affection, the evidence reflects that Kristina has few positive feelings and no real emotional ties to Mrs. P. Kristina does have some positive feelings but little emotional connection to Mr. P. Both respondents, however, do sincerely care for Kristina's welfare. Indeed, the evidence reflects that at all times, Mr. P. was a caring father.
Kristina has some positive feelings toward her second and third foster parents. The court, however, is not convinced that the depth of those feelings resemble the affection that ordinarily exists between a parent and a child. Kristina's present foster mother is her psychological parent.
5. Finding regarding the age of the child.
Kristina is 8 1/2. CT Page 2528
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
The respondents have addressed their marital problems. Mr. P. now controls his bi-polar disorder with appropriate medication. He no longer self-medicates with alcohol.
The respondents were prevented by DCF from maintaining contact with Kristina after May, 1998, except for one visit in February, 1999.
It is not in Kristina's best interests to return to the respondents' home. Even sibling visits at the respondents' home are contraindicated until such time as the respondents, their sons and Kristina accept that there will be no reunification.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
Prior to the December 17, 1997 OTC, the respondents were prevented by their modest, lower-middle income circumstances from engaging the services and support that may have enabled them to properly care for and possibly even bond with Kristina.
After June, 1998, the respondents were prevented by DCF from visiting Kristina until February, 1999. After February, 1999, DCF offered only one or two closure visits.
It cannot, however, be said that DCF prevented the respondents from maintaining a "meaningful relationship" with Kristina. As held in In reGilbert, supra, "the term `meaningful relationship' must be understood in the context of a parent-child relation[ship.]" Since there never was such a relationship between the respondents and Kristina, due to Kristina's RAD and the respondents' lack of preparation for dealing with that condition, and since the respondents did not seek a parent-child CT Page 2529 relationship after June, 1998, DCF cannot be said to have prevented the respondents from maintaining a "meaningful relationship" with Kristina.
 VIII
It would be inappropriate to proceed to judgment without commenting further on one impropriety committed by a DCF social worker. As discussed supra, DCF social worker Jennifer Chokas stated to Ann Tuller, President of AMPS, that DCF was withholding visitation from Kristina's parents as a form of "emotional blackmail." For a DCF social worker to utter such an expression is shocking and deserving of the strongest condemnation by this court. Moreover, if the words aptly described DCF's policy in this case, then they reflected lawlessness by an agency of government that must not be tolerated. Beyond this case, the court's overarching concern is that if Chokas' remarks were not merely the product of an isolated lapse in judgment, or the expressions of a rogue worker, they may reflect an arrogance borne of a culture within the agency, a segment of the agency or a regional office of the agency. Such bureaucratic arrogance is inconsistent with "the great and essential principles of liberty and free government." Constitution of the State of Connecticut, Article First, Declaration of Rights.
This court does not possess a roving commission to investigate malfeasance in Connecticut state agencies. Therefore, the assistant attorney general having responsibility for this case is directed to immediately bring this matter to attention of the commissioner, the State Advisory Council on Children and Families, and the Office of Child Advocate.
 IX
The petition is granted. The court terminates the respondents' parental rights. Because no other appropriate person has come forward and made herself available, the Commissioner of the Department of Children and Families is appointed statutory parent for Kristina. See General Statutes § 45a-718. The commissioner shall file with the court no later than 90 days following the date of judgment a written report of efforts to effect a permanent placement for Kristina and file further reports as are required by state and federal law. Should the commissioner disagree with the therapeutic or placement opinions of Dr. Gruenberg, the commissioner shall file a report with the court detailing the reasons that Dr. Gruenberg disagrees with the commissioner.
Dated at Middletown this 16th day of February, 2001.
BY THE COURT CT Page 2530
Bruce L. Levin Judge of the Superior Court